## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
June 4, 2019 Session

## DEARICK STOKES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 09-01312          James M. Lammey, Judge**

_____

## No. W2018-01435-CCA-R3-PC
_____

The Petitioner, Dearick Stokes, was denied post-conviction relief from his convictions for felony murder and attempted especially aggravated robbery and his effective life sentence. On appeal, the Petitioner alleges that trial counsel was ineffective for failing to: (1) interview and subpoena four eyewitnesses who identified another individual as being present at the crime scene; (2) investigate and adequately cross-examine a police officer regarding the crime scene; (3) investigate or present rebuttal witnesses concerning admissions allegedly made by the Petitioner; (4) obtain and review the victim's cellular phone records; (5) investigate and discuss the case with the Petitioner; and (6) properly investigate a witness for the State and request *Jencks* material relative to him. The Petitioner additionally contends that either the State committed a *Brady* violation by failing to provide a witness's supplemental statement to trial counsel or, if it was provided, counsel's failure to use it during cross-examination was ineffective assistance of counsel. Furthermore, the Petitioner argues that he received ineffective assistance of appellate counsel because appellate counsel should have asserted on direct appeal that the trial court (1) improperly denied his motion for a mistrial due to juror intimidation, and (2) committed plain error by allowing a witness to testify as to how he discovered the Petitioner's real name. After a thorough review of the record, we discern no error and affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

James E. Thomas (at hearing) and Vicki M. Carriker (on appeal), Memphis, Tennessee, for the appellant, Dearick Stokes.

Herbert H. Slatery III, Attorney General and Reporter; Robert Wade Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Gavin Smith, Leslie Byrd, and Stephanie Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

**Trial Proceedings**

This appeal arises from the Petitioner's convictions of felony murder during the perpetration of an aggravated robbery and attempted especially aggravated robbery. According to the State's proof at trial, on the afternoon of July 13, 2008, the Petitioner and an accomplice shot and killed the victim, Bryan Hatchett, during an attempted robbery. The Petitioner filed a direct appeal, in which he challenged the sufficiency of the evidence "because the proof showed that the killing of the victim occurred during an attempted aggravated robbery, rather than an aggravated robbery, as alleged in the indictment." *See State v. Dearick Stokes*, No. W2010-02622-CCA-R3-CD, 2012 WL 1656918, at *1 (Tenn. Crim. App. May 10, 2012), *perm. app. denied* (Tenn. Aug. 15, 2012). This court rejected the Petitioner's challenge and denied relief. *Id.* at *4. This court gave the following synopsis of the underlying facts of the case on direct appeal as follows:

> On July 13, 2008, the [Petitioner] asked Kenneth Richardson, his partner in a "dope" business, to let him have the nine-millimeter pistol that the two men shared, telling him that he was "fixin' to go get some money." That same evening, the [Petitioner] called Richardson and told him that he had shot someone and injured his leg by jumping out of a moving vehicle. A short time later, the [Petitioner] sold the pistol to Richardson.

> At approximately 4:12 p.m. on July 13, 2008, Kelvin Townsel was barbequing in the front yard of his sister's home, located at the corner of Warren and Ferguson in Memphis, when he heard gunshots. A few minutes later, he saw three individuals, including one he recognized as the [Petitioner], running up the hill on Warren to the Clementine Apartments. Townsel saw one of the three men toss an object into a field during his flight, and he passed that information along to the police, who subsequently searched the field and found a .38 caliber revolver containing two spent rounds and one live bullet. Ballistics testing revealed that a bullet

recovered from the victim's chest and another from his clothing had been fired through the barrel of that gun.

Memphis police officers responded to the shooting scene to find the victim's four-door Chevrolet HHR rolling slowly down the hill with its front passenger door and one of its rear passenger doors open, the victim lying dead on the driver's floorboard from multiple gunshot wounds, a Buick Rendevous nearby with a nine-millimeter bullet lodged in its steering column, and a spent nine-millimeter shell casing lying on the street. Over $300 in cash was recovered from the victim's body and a .8 gram bag of cocaine was found on the floorboard of the front passenger side of the victim's vehicle. A DNA swab sample taken from the interior front passenger door of the victim's vehicle matched the [Petitioner]'s DNA profile.

Vincent Roberts saw the [Petitioner] on three separate occasions on the evening of July 14, 2008. The first time, he was at home when his cousin brought the [Petitioner] by his house to talk to him. The [Petitioner] first asked Roberts how much time he could get if he were with someone who killed a person and then told him that he had been with "Dwayne" and the victim in the victim's vehicle when "Dwayne" suddenly pulled a gun. The [Petitioner] told Roberts that he had gotten scared, jumped out of the vehicle, and then heard a gunshot.

Approximately thirty to forty minutes later, Roberts was leaving a neighborhood grocery when he overheard Kenneth Richardson say to the [Petitioner], "I told you to leave the gun--made me give it to you anyway--and now you got a murder case and a charge partner."

Still later, the [Petitioner] returned to Roberts' house, where he gave a somewhat different version of events, telling Roberts that "Dwayne" had called the victim under the pretense of wanting to buy some pills from him, that he (the [Petitioner]) had gotten into the front passenger seat of the victim's vehicle while Dwayne got into the back, that he and Dwayne each pulled weapons on the victim to rob him, and that Dwayne then shot the victim in the back of the head. The [Petitioner] also showed Roberts a skinned place on his leg, telling him that his leg had been "scarred" when he jumped from the victim's moving vehicle after the shooting.

Photographs of the [Petitioner] taken by the police on July 17, 2008, show that he had a large scrape or injury to his lower right leg.

On the afternoon of July 16, 2008[,] Kenneth Richardson was arrested on drug charges. At the time of his arrest, he had a loaded nine-millimeter gun in his waistband and identification that belonged to "Dwayne Cooper, Jr." The nine-millimeter shell casing found at the crime scene and the bullet recovered from the Buick Rendevous matched the weapon recovered from Richardson.

*Id*. at *1-2.

## Post-Conviction

The Petitioner, through post-conviction counsel, filed a timely post-conviction petition, as well as several amended petitions. Relevant to this appeal, the Petitioner raised in his petitions various allegations of ineffective assistance of trial and appellate counsel. The post-conviction court conducted evidentiary hearings over the course of three dates.

The Petitioner's lead trial counsel testified that he had practiced law for at least forty-five years at the time he represented the Petitioner. He recalled speaking with the Petitioner about his case several times before the trial and remembered visiting the crime scene with co-counsel to "[l]ook[] all that over." Per his typical practice, lead counsel did not employ an investigator on the case because "[i]t's awfully hard to look at this through somebody else's eyes." He recalled that the incident occurred on the street close to a store referred to as "the castle." Lead counsel said that he could not locate the Petitioner's file and believed he might have sent it to the Petitioner's father or appellate counsel.

Lead counsel testified that it was his practice to cross-examine a witness regarding a prior inconsistent statement that implicated one of his clients. He did not recall seeing a supplemental narrative statement taken by Memphis police officers on October 20, 2008 regarding Mr. Kenneth Richardson. The unsigned supplement stated that Mr. Richardson told officers that he had possession of the murder weapon "the entire time" from when he bought it in April until his arrest in July 2008. Mr. Richardson's formal statement relayed that the Petitioner owned the weapon, that Mr. Richardson had possession of it, that the Petitioner asked for the weapon on the day of the murder, and that Mr. Richardson gave it to him. After reviewing Mr. Richardson's supplemental statement, lead counsel agreed that it was exculpatory to the Petitioner and that the State was obligated to provide the statement. Lead counsel reiterated that the narrative supplemental statement was never in his possession and that the first time he saw it was

- 4 -

the morning of the post-conviction hearing.  He believed he would have "jumped [Mr. Richardson] a little bit" at trial had he been aware of it.

Lead counsel recalled that the State called Mr. Kelvin Townsel as a witness.  Lead counsel did not remember having a chance to talk to Mr. Townsel before trial, and he did not recall seeing Mr. Townsel's name on any discovery.  Lead counsel believed that he asked for *Jencks* material after Mr. Townsel testified.

Lead counsel testified that he did not file an alibi notice in this case.  He did not recall if he ever spoke with Mr. Charlton Collins, who could have been offered as a witness for the defense, or Mr. Bobby Partee, the Petitioner's brother, regarding the Petitioner's alibi.  Lead counsel was unable to recall Mr. Richardson having an ID with the name Dwayne Phipps when he was arrested.  Lead counsel did not remember whether he saw a document listing four individuals interviewed by Lieutenant Ronald Collins who identified a person other than the Petitioner running from the crime scene.  Post-conviction counsel, however, informed the court that the trial transcript reflected that lead counsel had attempted to introduce the document at trial.  Lead counsel said he would have tried to interview the people listed if he had seen the document.  If the interviews disclosed that they "would have not made good witnesses" or if it was "obvious that they didn't see what they claimed they saw[, then] we would have not put them on."

Lead counsel recalled that Mr. Richardson originally invoked his Fifth Amendment rights at trial.  Mr. Richardson was then arrested in the hallway outside the courtroom on the charge of facilitation of first degree murder and "came to court the next day . . . [and] that warrant got withdrawn[,] and he sang like a little bird."  Lead counsel believed that he referred to Mr. Richardson's transaction with the State in his questioning of Mr. Richardson and argument to the jury.  He felt sure that he had conversations with Mr. Richardson's attorney regarding what had occurred.

Assistant District Attorney General Kevin Rardin was the lead prosecutor for the State in the Petitioner's case.  General Rardin testified that it was his practice to provide open-file discovery to defendants' attorneys.  General Rardin was shown Exhibit D, a document listing four individuals interviewed by Lieutenant Collins who identified a person other than the Petitioner running from the crime scene.  The trial transcript indicated that lead counsel was given the document two weeks prior to trial and that lead counsel attempted to enter the document into evidence.  The transcript further indicated that the trial court found that the document was exculpatory but denied the request, ruling that lead counsel should have subpoenaed the individuals.  General Rardin reiterated that the State's theory of the case was not that the Petitioner "fired the killing shot," but instead that the Petitioner was a perpetrator in robbing the victim and that another perpetrator fired the fatal shot.  Because of the State's theory of criminal responsibility,

General Rardin believed that Exhibit D, where witnesses identified someone other than the Petitioner running from the crime scene, did not necessarily exculpate the Petitioner.

General Rardin recalled that the investigation in the case was on-going, with information coming in right up to the trial date and that he would have turned over all potentially exculpatory evidence immediately. General Rardin had no recollection of providing lead counsel with a copy of Exhibit B, the narrative supplemental statement of Mr. Richardson. General Rardin thought it was possible that he received the supplemental statement after trial and said that he would have turned over an inconsistent document if it had been in his possession. Although he acknowledged that Mr. Richardson's supplemental and formal statements contained inconsistent information, he noted that the weapon Mr. Richardson possessed at the time of his arrest was not the murder weapon. Rather, it was the gun that produced a casing found at the scene.

General Rardin reviewed a supplement written by Sergeant P. Harris that indicated the victim's personal effects, including a cellular phone, were returned to the victim's family after the autopsy. General Rardin said the cellular phone might have had evidentiary value if it listed a call between the victim and the Petitioner. He stated that without evidence of the cell phone records, any evidentiary value of the victim's cellular phone would be speculative.

General Rardin was asked about a statement made during Mr. Townsel's testimony in which Mr. Townsel stated that someone told him the Petitioner's name. General Rardin agreed that the testimony would be hearsay and was possibly not beneficial to the Petitioner. However, General Rardin noted that he had heard that defense attorneys sometimes will not object to hearsay testimony if "they don't think it's a big issue." General Rardin noted that he sometimes chose not to make a proper objection at trial as a strategic decision.

General Rardin testified that he felt that the proof against the Petitioner was very strong. He said that he had tried cases where a defense attorney did not cross-examine someone on a prior statement or put on some witnesses but not every witness was mentioned in discovery. He noted that lead counsel was "very vigorous" in his representation of the Petitioner.

Mr. Jake Stokes, the Petitioner's father, testified that he hired lead counsel to represent the Petitioner, and they visited counsel's office ten to fifteen times to make payments and talk about the case. However, according to Mr. Stokes, each meeting only lasted for ten minutes, and they never discussed discovery, reviewed the case, or prepared for trial. He recalled that counsel would "tell us a joke or two" and for them to "just go on home" because the State "ain't got nothing on him." Mr. Stokes said that lead counsel

indicated that they were "going to pull an all nighter" to prepare for the case, but they "never did." He recalled that lead counsel did not tell them that there were witnesses against the Petitioner until right before trial when he told them that there were two witnesses coming from the penitentiary who would not be credible.

Mr. Stokes testified that he read in the police reports that witnesses saw two or three men running away from the scene, but he did not remember any witnesses saying that they recognized the Petitioner. Mr. Stokes recalled that he was present when the Petitioner and lead counsel discussed a claim of an alibi defense, and he acknowledged that an alibi witness testified at trial. Mr. Stokes remembered lead counsel talking to them about the Petitioner's potential sentence but that counsel recommended that the Petitioner go to trial because "they ain't got nothing on [him]."

Mr. Bobby Partee, the Petitioner's brother, testified that he did not take the Petitioner to see Mr. Vincent Roberts the day after the incident, nor did he ever see the Petitioner talking with Mr. Roberts or Mr. Collins together. According to Mr. Partee, lead counsel never asked him if he was involved in a conversation between the Petitioner and Mr. Roberts. Mr. Partee admitted that he attended some of the meetings with lead counsel, the Petitioner, and Mr. Stokes before trial but that he never told lead counsel that he did not know Mr. Roberts. Mr. Partee said that he did not stay and watch the Petitioner's entire trial.

Mr. Neil Umstead, a defense attorney who represented Mr. Richardson, testified that when Mr. Richardson was arrested on July 16, he was in possession of a gun that the State alleged was the murder weapon in the present case. Mr. Umstead received discovery but did not receive a copy of Exhibit B, the narrative supplemental statement in which Mr. Richardson said that he had possessed the gun the entire time from April until his arrest in July. He did not remember lead counsel questioning Mr. Richardson about the supplemental statement when he testified at the Petitioner's trial. After Mr. Richardson testified, his facilitation of first degree murder charge was dismissed.

Mr. Kelvin Townsel recanted his trial testimony. He testified that he came to be involved in the Petitioner's case because his nephew found a gun in the yard, which Mr. Townsel threw into a field. Police officers came to his house, and he told them that he did not see anything but that there was a gun in the field. Later, when he was serving a sentence on an unrelated voluntary manslaughter case, he was brought in as a witness at the Petitioner's trial. He met with the prosecutor briefly before he testified, and he told her that he did not see anything. Lead counsel did not meet with him before he testified. Mr. Townsel said that he testified that he did not see or know the Petitioner but that after the prosecutor "kept ask[ing]" him questions, he identified the Petitioner. He said he lied

at trial because he "[g]ot tired of [the prosecutor] questioning [him]." Mr. Townsel maintained that he had never seen the Petitioner before the day that he testified at trial.

Mr. Townsel recalled that he told the police that he saw people running by when he was barbecuing in his sister's yard and saw someone throw something. However, he said that he did not tell the police that the Petitioner was one of the people he saw running. He did not identify the Petitioner in a lineup or give a formal written statement. Mr. Townsel denied knowing a person who went by the name of "P Red" and said that officers lied if they testified that Mr. Townsel informed them that he saw "P Red" running from the scene. Mr. Townsel denied hearing any gunshots while he was barbecuing in his sister's yard. He also denied talking to people in the neighborhood about the Petitioner's real name.

Appellate counsel, an attorney with thirty years of appellate experience, represented the Petitioner on direct appeal. Appellate counsel raised the issue that there was a variance between the Petitioner's indictment and the proof presented at trial. He recalled that lead counsel had raised in the motion for new trial an issue about the denial of a mistrial. However, he did not believe that there was a sufficient basis for raising the issue on appeal.

Co-counsel testified that he became involved in the Petitioner's case on the day of trial. Co-counsel recalled Exhibit D, a document that listed witnesses who identified someone other than the Petitioner leaving the scene, and his trying to get the document admitted at trial. He did not recall attempting to contact or subpoena any of those witnesses. He said that not attempting to speak with those witnesses would be a mistake and should have been done in preparation for trial. He remembered that the trial court excluded the document at trial.

Co-counsel reviewed the supplemental and formal statements of Mr. Richardson and agreed that they appeared to be inconsistent. Co-counsel said that he reviewed the Petitioner's case file and did not see the supplemental statement in the file. He said that the State gave them open file discovery and that he did not recall the supplement being in the State's file. Co-counsel believed they would have impeached Mr. Richardson regarding the supplemental statement if it was in their possession, and it would have been error if they did not because he believed the document to be exculpatory. However, co-counsel acknowledged that the supplemental statement would only be exculpatory if considered "by itself," without the existence of the formal written statement, and that the Petitioner's possession of the weapon would not be exculpatory if the State's theory was that the Petitioner was criminally responsible for the victim's murder.

Co-counsel remembered that the jurors wanted to see the surveillance video a second time because one of the suspected perpetrators in the video had "[s]trikingly similar" shoes to those the Petitioner was wearing when officers photographed the injuries to his leg. Co-counsel also admitted that there were witnesses who indicated that the Petitioner made certain admissions and that the Petitioner's DNA was found in the victim's car.

Co-counsel was also asked about Mr. Townsel's testimony. He said that he would have objected to Mr. Townsel's testimony as hearsay if Mr. Townsel testified that he learned the name of "P Red" from someone else. However, co-counsel later clarified that he was unlikely to make a hearsay objection if Mr. Townsel's testimony was that he knew the Petitioner as "P Red" and later learned his real name from other people. Co-counsel did not recall whether the defense was provided with *Jencks* material regarding Mr. Townsel.

Co-counsel testified that he met with the Petitioner's family during and after trial. He did not recall the Petitioner's brother, Mr. Partee, ever telling them that he was not part of certain conversations between the Petitioner and other witnesses. He would have called such witness to testify in the Petitioner's defense if the witness said they were not present during the conversations as alleged.

Mr. Michael Scholl, a defense attorney testifying as an expert on the Petitioner's behalf, stated that he examined certain documents in the case as well as the trial testimony of Mr. Richardson. In Mr. Scholl's opinion, the narrative supplemental statement of Mr. Richardson was exculpatory, and even if the State did not intentionally withhold the document, the failure to disclose it was still a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Mr. Scholl believed that the document was material because Mr. Richardson maintained at trial that the gun did not belong to him but to the Petitioner. Mr. Scholl said that if the Petitioner's counsel possessed Mr. Richardson's supplemental statement, it was ineffective assistance not to cross-examine Mr. Richardson with the statement because one of the bullets found at the crime scene matched with the weapon found on Mr. Richardson. Mr. Scholl further stated that because there were witnesses who identified another perpetrator who was not the Petitioner, counsel could have argued that Mr. Richardson was the perpetrator and was lying to get out of his charges. Mr. Scholl additionally believed it was a "pretty blatant error" for an attorney not to speak to or subpoena witnesses who identified someone else. Mr. Scholl said that two weeks would be a short time in which to execute subpoenas for the witnesses who identified another perpetrator but that it could be done.

On cross-examination, Mr. Scholl admitted that while he reviewed Mr. Richardson's trial testimony word-for-word, he only reviewed this court's summary on

direct appeal of the remaining evidence presented at trial. Mr. Scholl felt that this court's summary of the proof was "completely wrong" when taking into consideration that individuals who identified a person other than the Petitioner were not called at trial. Mr. Scholl stated that the issue with Mr. Richardson's statement was not that he had just omitted details but that he clearly lied about who possessed the gun during the time period in issue. He said Mr. Richardson went "back and forth" in his testimony about whether he and the Petitioner shared the weapon or the Petitioner owned it. Mr. Scholl felt that defense counsel could have "put this case completely on" two individuals other than the Petitioner regardless of the State's theory of criminal responsibility, and that the defense did not have to prove its theory beyond a reasonable doubt. Mr. Scholl acknowledged that he was aware that witnesses testified to the Petitioner's admissions to the crime, that the Petitioner had corroborating leg injuries, that the Petitioner's DNA matched DNA found in the victim's car, and that jurors placed "great importance" on the similarity between the shoes in the surveillance footage and shoes the Petitioner was wearing when interviewed by the police.

The Petitioner also testified. He first admitted that before the jury announced the verdict, he left the courthouse and later pled guilty for failing to appear in court. With regard to preparation for trial, the Petitioner said that he visited lead counsel's office numerous times to make a payment and discuss the case but that he only talked with lead counsel "no more than five to [ten] minutes" during the meetings. The Petitioner asserted that lead counsel told him that he did not think the case would go to trial and never discussed "discovery, anything like that." The Petitioner claimed that lead counsel told him that they would "go over this case all night one night" but that they never did.

The Petitioner stated that he knew nothing about a statement in which Mr. Alonso Roberts Deel was identified as a suspect until lead counsel tried to have the statement admitted into evidence and the trial court denied its admittance. The Petitioner said he and counsel never discussed any witness statements or motions.

According to the Petitioner, the first time he heard about Mr. Roberts' claim that he, the Petitioner, had supposedly made admissions to Mr. Roberts, Mr. Collins, and Mr. Partee was at trial. The Petitioner asserted that he told lead counsel that Mr. Partee was "right there" and that they needed to contact Mr. Collins. He said that lead counsel indicated that he would try to use Mr. Partee as a rebuttal witness.

With regard to his appeal, the Petitioner recalled that he and his father had many telephone conversations with appellate counsel. He said he wanted appellate counsel to raise the issues that were asserted in the motion for new trial. Appellate counsel told him that he would raise those issues but did not do so.

- 10 -

Post-conviction counsel informed the court that Mr. Charlton Collins was unavailable to testify but that his testimony would have been that he was not present at a meeting between Mr. Roberts and the Petitioner when the Petitioner made incriminating admissions.

The post-conviction court denied relief by written order on July 16, 2018. In its order, the court found that a police supplement containing a statement of Mr. Richardson regarding the possession of a weapon was not material under *Brady*. The post-conviction court stated that Mr. Richardson's possession of a gun linked to the crime scene was not dispositive of the Petitioner's guilt. The court reasoned that (1) although the supplement would have been useful to impeach Mr. Richardson, even if impeached, Mr. Richardson's in-court testimony was consistent with his formal statement and "consistent with the other proof offered"; (2) the supplement merely "contain[ed] the impressions of the officers regarding their initial conversation with [Mr.] Richardson," and Mr. Richardson was "thoroughly cross examined about his initial reluctance to testify"; and (3) Mr. Richardson testified at trial that the Petitioner "offered [him] money . . . to either not testify or to give false statements regarding [the] [P]etitioner's involvement." The post-conviction court found that if lead counsel was in possession of the narrative supplement and failed to utilize it, although arguably deficient, the Petitioner failed to establish prejudice. The court described lead counsel's cross-examination of Mr. Richardson as "masterful" and stated that counsel thoroughly cross-examined Mr. Richardson on his motivation for testifying, his truthfulness, his potential involvement in the crime, and his initial refusal to provide testimony.

The post-conviction court found that even if counsel was deficient in failing to subpoena and present witnesses at trial who positively identified someone other than the Petitioner as running from the scene, the Petitioner failed to establish prejudice because he did not call any of the purported witnesses at his post-conviction hearings. The court concluded that Mr. Townsel's recanted trial testimony was not an appropriate claim for post-conviction relief and that Mr. Townsel's evidentiary hearing testimony was "wholly incredible[.]" The court denied the Petitioner's other claims for relief as being "without merit." The Petitioner appealed.

## ANALYSIS

The Petitioner claims that he received ineffective assistance of trial counsel because counsel failed to: (1) interview and subpoena four eyewitnesses who identified another individual as being present at the crime scene; (2) investigate and adequately cross-examine Lieutenant Collins regarding the crime scene; (3) investigate or put on rebuttal witnesses concerning admissions allegedly made by the Petitioner; (4) obtain and review the victim's cellular phone records; (5) investigate and discuss the case with the

Petitioner; and (6) properly investigate Mr. Townsel and request *Jencks* material relative to him. The Petitioner additionally contends that either the State committed a *Brady* violation by failing to provide Mr. Richardson's supplemental statement to trial counsel or, if it was provided, counsel's failure to use it during cross-examination was ineffective assistance of counsel. The Petitioner also argues that he received ineffective assistance of appellate counsel because appellate counsel should have asserted on direct appeal that the trial court (1) improperly denied his motion for a mistrial due to juror intimidation, and (2) committed plain error by allowing Mr. Townsel to testify as to how he discovered the Petitioner's real name.

Under the Post-Conviction Procedure Act, a petitioner is entitled to relief when "the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The burden of proving allegations of fact by clear and convincing evidence falls to the petitioner seeking relief. T.C.A. § 40-30-110(f). The post-conviction court's findings of fact are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Accordingly, the reviewing court defers to the post-conviction court's findings regarding the credibility of witnesses, the weight and value of witness testimony, and the resolution of factual issues. *Id*. Questions of law and mixed questions of law and fact are reviewed de novo. *Id*. Each element of a claim of ineffective assistance of counsel is a mixed question of law and fact. *Id*.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to the effective assistance of counsel. *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016). To prevail on a claim that he was denied his constitutional right to effective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficient performance caused prejudice to the defense. *Kendrick*, 454 S.W.3d at 457 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

Deficiency requires showing that counsel's errors were so serious "'that counsel was not functioning as the "counsel" guaranteed the [Petitioner] by the Sixth Amendment.'" *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014) (quoting *Strickland*, 466 U.S. at 687). To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). In evaluating deficiency, courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 689). "'[A] reviewing court must

be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland*, 466 U.S. at 690-91). The reviewing court must begin with the presumption "that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Honeycutt*, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting *Strickland*, 466 U.S. at 694). The petitioner must show that the deficiency deprived him of a fair trial and called the reliability of the outcome of the proceeding into question. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007). A claim may be denied for failure to establish either deficiency or prejudice, and the reviewing court need not address both components if a petitioner has failed to establish one. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

## I. Allegations against Trial Counsel

The Petitioner first argues that trial counsel was ineffective because he failed to interview and subpoena four eyewitnesses who identified another individual as being present at the crime scene. However, the Petitioner failed to present the witnesses at the post-conviction hearing that he claimed should have been called on his behalf at trial. The failure to present such witnesses precludes this court and the post-conviction court from making a determination of how the Petitioner was prejudiced by trial counsel's failing to present their testimony. *See, e.g., Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

The Petitioner next argues that trial counsel was ineffective because he failed to investigate and adequately cross-examine Lieutenant Collins regarding the crime scene. He specifically points to Lieutenant Collins's supplement, which indicated that witnesses described an individual who did not match the Petitioner's description near the scene. The transcript at trial indicates that the trial court granted the State's motion in limine to bar counsel from asking Lieutenant Collins about witnesses' "out-of-court identifications" because the identifications constituted impermissible hearsay. The court allowed lead counsel to "get into the fact that [Lieutenant Collins] interviewed these

witnesses and showed them photospreads, but nothing more."[1]  During lead counsel's cross-examination of Lieutenant Collins, the trial court reiterated that lead counsel could "ask him if he showed photo lineups, but not what was said."  Consistent with the trial court's ruling, lead counsel cross-examined Lieutenant Collins about providing photospreads to four witnesses and the times that the photospreads were shown.  Lead counsel could not question Lieutenant Collins about specific statements, including identifications, any witness made during their photospread selections.  The Petitioner cannot show that lead counsel's representation fell "below an objective standard of reasonableness" by complying with the trial court's ruling.

The Petitioner next argues that trial counsel was ineffective because he failed to investigate or put on rebuttal witnesses, namely Mr. Partee and Mr. Collins, concerning admissions allegedly made by the Petitioner.  As to counsel's failure to present Mr. Collins as a witness, the Petitioner has failed to establish prejudice because Mr. Collins did not testify at any of the evidentiary hearings.  *See Black*, 794 S.W.2d at 757.  Despite post-conviction counsel's assertion that Mr. Collins "would testify . . . that he wasn't present at [Mr.] Roberts'," Mr. Collins' failure to testify would require this court to "speculate or guess . . . on what [his] testimony might have been if introduced by defense counsel."  *Id*.

With regard to Mr. Partee, neither lead counsel nor co-counsel were aware that he could rebut Mr. Roberts' claim that the Petitioner made certain admissions to him in Mr. Partee's presence.  Both lead counsel and co-counsel testified that they did not recall discussing Mr. Roberts' conversations with Mr. Partee before, during, or after trial despite Mr. Partee having several opportunities to inform them that he was not present during the conversations as alleged.  Mr. Partee also testified that he did not recall informing counsel that he was not present during the conversations.  Co-counsel testified that they would have introduced a witness at trial if the witness indicated he was not present during a conversation as alleged by the State.  The Petitioner has failed to show by clear and convincing evidence that counsel were aware that Mr. Partee would have denied conversations between the Petitioner and Mr. Roberts.  Additionally, the Petitioner has not shown that his brother's, an interested party, denial of a conversation would have negated the other evidence against him.

The Petitioner next argues that trial counsel was ineffective because he failed to obtain and review the victim's cellular phone records.  However, the Petitioner did not present the victim's cellular phone records at any of his evidentiary hearings and, without such proof, this court would be forced to speculate as to the contents.  *See Black*, 794

---

[1] General Rardin indicated to the trial court that Sergeant Justice "investigated . . . th[e] other person" identified by the witnesses, that the person "provided an alibi, . . . and the alibi checked out."

S.W.2d at 757-58; *Michael Davis v. State*, No. W2017-01592-CCA-R3-PC, 2018 WL 3599959, at \*7 (Tenn. Crim. App. July 26, 2018) ("Without more specific testimony or the introduction of the phone records as an exhibit, we cannot determine whether the existence of the alleged phone calls or the timing of the alleged phone calls would have had an impact on the outcome of the trial."). The Petitioner has failed to establish prejudice.

The Petitioner next argues that trial counsel was ineffective because he failed to investigate and discuss the case with the Petitioner. Lead counsel testified that he talked with the Petitioner several times regarding his case and investigated the crime scene with co-counsel. By denying the Petitioner relief, the post-conviction court implicitly accredited lead counsel's testimony over that of the Petitioner and his witnesses. The Petitioner has failed to prove that counsel rendered deficient performance.

The Petitioner next argues that trial counsel was ineffective because he failed to properly investigate Mr. Townsel and request *Jencks* material relative to him. We initially note that Mr. Townsel's recanted testimony is not proper for post-conviction review. "[T]his court has previously held that claims of recantation are generally not proper for post-conviction review. '[R]ecanted testimony amounts to no more than a request to relitigate the sufficiency of the evidence at trial and is not a proper subject of post-conviction relief.'" *Marlon Duane Kiser v. State*, No. E2016-01644-CCA-R3-PD, 2017 WL 6549893, at \*18 (Tenn. Crim. App. Dec. 21, 2017), *perm. app. denied* (Tenn. Apr. 19, 2018) (quoting *Teresa Deion Smith Harris v. State*, No. W2000-02611-CCA-R3-PC, 2001 WL 892848, at \*1 (Tenn. Crim. App. Aug. 2, 2001)).

Even if Mr. Townsel's post-conviction testimony is properly before this court, the post-conviction court found it "wholly incredible." The trial transcript also belies the Petitioner's contentions. Before the State called Mr. Townsel as a witness, lead counsel informed the trial court that he attempted to talk with Mr. Townsel but that Mr. Townsel "did not want to talk about the facts of the case." During cross-examination, Mr. Townsel confirmed that he did not want to talk about the case with lead counsel until he was called as a witness. During a recess, lead counsel informed the court that he asked the State for any *Jencks* material involving Mr. Townsel, and the State responded that it had provided lead counsel with a supplement. The Petitioner is not entitled to relief on this claim.

## II. Allegations Related to Kenneth Richardson

The Petitioner next argues that either the State committed a *Brady* violation by failing to provide Kenneth Richardson's narrative supplemental statement to trial

counsel, or, if it was provided, counsel's failure to use it during cross-examination was ineffective assistance of counsel.

The suppression of evidence favorable to the accused is a due process violation when the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the evidence or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the evidence that was suppressed was favorable to the accused; and (4) the evidence meets the standard of materiality. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). The defendant has the burden of proving a violation by a preponderance of the evidence. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995), *as amended on rehearing* (Tenn. July 10, 1995).

Mr. Richardson's statement at issue was found in a police supplement. The writer of the supplement detailed that Mr. Richardson "stated that the handgun he was arrested with could not have been used in the homicide because he had it the entire time from April until his arrest in July." At trial and consistent with his formal statement, Mr. Richardson testified that the Petitioner had possession of the gun on the day of the victim's murder.

The post-conviction court determined that Mr. Richardson's supplemental statement was not material under *Brady* and that lead counsel's failure to use the statement, if it was in his possession, was not prejudicial under *Strickland*. Our conclusion is the same whether analyzed under *Brady* or *Strickland*: the Petitioner fails to show that there is a reasonable probability that the result of the proceeding would have been different if the supplemental statement had been used at trial. *See Edgin*, 902 S.W.2d at 390; *see also Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. 2004) (stating that the "'materiality' aspect of a *Brady* claim is governed by the same prejudice standard as an ineffective assistance of counsel claim; that is, a defendant must show that there is a reasonable probability that the result of the proceedings would have been different").

As found by the post-conviction court, lead counsel's cross-examination of Mr. Richardson "was masterful" in attacking Mr. Richardson's credibility. The cross-examination consisted of over fifty pages of trial transcript, during which it was revealed that Mr. Richardson had an interest in testifying against the Petitioner and that his testimony was inconsistent between his direct and cross-examinations. Mr. Richardson admitted that he waived his originally asserted Fifth Amendment right not to testify after he was arrested and charged with facilitation of first-degree murder. In exchange for having the facilitation charge dismissed, Mr. Richardson agreed to testify against the Petitioner.

During the cross-examination, Mr. Richardson denied that he knew that the Petitioner would commit a robbery when the Petitioner asked him for the weapon, but in his formal statement said that he knew the Petitioner and another person were going to rob someone. Mr. Richardson explained the discrepancy by stating that he "could have been lying . . . [or] wrong" in his statement. He further stated on cross-examination that the Petitioner did not tell him that he had used a weapon, but Mr. Richardson testified on direct examination that the Petitioner told him that he shot someone. Mr. Richardson agreed that an officer told him to "try to save [him]self" after he was informed that shell casings from his weapon were found near the crime scene, and he also agreed that cooperating with officers was a "sure . . . good way to save [himself] . . . for a few months." Mr. Richardson admitted that the officer told him that his cooperation would be made known to the State.

The State's agreement with Mr. Richardson was introduced at trial, and it provided that Mr. Richardson's facilitation charge would be dismissed if he testified truthfully against the Petitioner. On re-cross examination, Mr. Richardson acknowledged that he denied knowing that the weapon was used in the victim's murder until he was told that officers found shell casings. We fail to see how introducing another inconsistent statement of an interested witness would establish a lack of credibility that was already severely damaged.

Moreover, cross-examining Mr. Richardson with the supplemental statement would not have negated other evidence connecting the Petitioner to the victim's murder. DNA evidence from the passenger side door handle of the victim's car placed the Petitioner in the victim's vehicle. Mr. Townsel testified that while he was outside barbecuing, he heard gunshots and saw three people running, one of whom he identified as the Petitioner. Mr. Roberts testified that the Petitioner told him that he and a person named Dwayne were in a car with the victim, the other person pulled out a weapon, "and [the Petitioner] got scarred and jumped out [of] the car, and he heard a shot." Mr. Roberts said that a short while later he overheard Mr. Richardson telling the Petitioner that he "told [the Petitioner] to leave the gun—made me give it to you anyway—and now you got a murder case and a charge partner." Mr. Roberts also said that a short while after that, the Petitioner elaborated to him that he and Dwayne got into the victim's car to buy pills, both the Petitioner and Dwayne brandished weapons, and the Petitioner jumped out of the car while it was moving after Dwayne shot the victim. The Petitioner showed Mr. Roberts the scars he received on his leg from jumping out of the car. At the evidentiary hearing, co-counsel testified that under the State's theory of criminal responsibility, the Petitioner's actual possession of a weapon would not be exculpatory. He also noted that the jury thought it was significant that the person on the convenience store's surveillance footage wore "[s]trikingly similar" shoes to those the Petitioner was wearing during his interview with the police. We cannot conclude that Mr. Richardson's

supplemental statement would have negated the aforementioned evidence against the Petitioner.

### III. Allegations against Appellate Counsel

The Petitioner lastly argues that he received ineffective assistance of appellate counsel because appellate counsel should have asserted on direct appeal that: (1) the trial court improperly denied his motion for a mistrial due to juror intimidation, and (2) the trial court committed plain error by allowing Mr. Townsel to testify as to how he discovered the Petitioner's real name.

First, as to the Petitioner's mistrial claim, during a recess in the trial, three jurors indicated that they noticed a person in the audience staring at them. However, none of the jurors stated that they felt threatened, and each juror informed the trial court that they could render a fair and impartial verdict. The trial court denied the Petitioner's motion for a mistrial because "none of [the jurors] looked to be in fear whatsoever." (pg. 784-86) "The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). A mistrial should be declared only upon a showing of manifest necessity, that is, when a miscarriage of justice would result if the trial were to continue. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). The appellant bears the burden of establishing manifest necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The decision to grant a mistrial lies within the sound discretion of the trial court. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003). The Petitioner has failed to prove that this court would have determined on direct appeal, had the issue been raised, that the trial court abused its discretion in denying a mistrial.

Second, as to the Petitioner's plain error claim, the Petitioner cannot show that appellate counsel was ineffective for failing to argue that the trial court committed plain error by allowing Mr. Townsel to testify as to how he discovered the Petitioner's real name.

For an error to constitute plain error, the following factors must be present:

(1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).  Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome'" of the proceeding.  *Id*. (quoting *Adkisson*, 899 S.W.2d at 642).  This court need not consider all the factors if it is clear that the defendant will fail to establish at least one.  *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010).  Plain error "would have to especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding."  *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  Hearsay is generally not admissible.  Tenn. R. Evid. 802.  "[R]arely will plain error review extend to an evidentiary issue."  *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007).

At trial, Mr. Townsel testified that he knew the Petitioner as "P Red" and that he learned the Petitioner's real name after speaking with others in the neighborhood.  He identified the Petitioner at trial as one of the individuals running from the crime scene.  Mr. Richardson and Mr. Roberts both testified at trial that the Petitioner admitted to them that he was one of the perpetrators of the murder.  Because other evidence established the Petitioner's identity as a perpetrator in the victim's murder, the Petitioner cannot show that he was prejudiced by appellate counsel's failure to argue on appeal that the hearsay issue constituted plain error.  *See State v. Tedarrius Lebron Myles*, No. E2016-01478-CCA-R3-CD, 2017 WL 2954690, at *6 (Tenn. Crim. App. July 11, 2017), *perm. app. denied* (Tenn. Nov. 16, 2017) (concluding that consideration of an error was not necessary to do substantial justice where evidence other than the admitted hearsay testimony established the defendant's identity); *John Earl Scales v. State*, No. M2003-01753-CCA-R3-PC, 2004 WL 1562542, at *8 (Tenn. Crim. App. July 13, 2004) (concluding that a post-conviction petitioner failed to establish prejudice caused by appellate counsel's failure to raise a hearsay issue because evidence other than hearsay "identifying the petitioner as the shooter" was admitted at trial).

## CONCLUSION

Based on the foregoing, we affirm the post-conviction court's denial of relief.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE